1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL E. MOCKOVAK,

                            Petitioner,

        v.

RON HAYNES,

                            Respondent.

Case No. C18-671-JLR-MLP

REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Petitioner Michael E. Mockovak ("Petitioner") is a state prisoner who is currently incarcerated at the Stafford Creek Corrections Center in Aberdeen, Washington. Petitioner seeks relief under 28 U.S.C. § 2254 from a 2011 judgment and sentence of the King County Superior Court. (Am. Pet. (Dkt. # 28).) Respondent filed an answer to Petitioner's amended habeas petition (Answer (Dkt. # 29).) Both parties have submitted relevant portions of the state court record. (State Court Recs. I-IX (Dkt. ## 42-45, 53, 55, 58-59).) The Court heard oral argument from the parties on March 8, 2021. (Dkt. # 72.)

Having considered the parties' submissions, the governing law, oral argument, and the balance of the record, the Court recommends that Petitioner's amended habeas petition (dkt.

1  # 28) be DENIED, that this action be DISMISSED with prejudice, and that a certificate of

2  appealability be DENIED as to all claims.

3  ## II.    BACKGROUND

4  ### A.    Statement of Facts

5  Petitioner is in custody under a state court judgment and sentence entered by the King

6  County Superior Court for his convictions of solicitation of murder, attempted murder,

7  conspiracy to commit theft, and attempted theft, all in the first degree. (State Court Rec. I (Dkt.

8  # 42-1), Ex. 1 at 2-9.) The Washington State Court of Appeals ("Court of Appeals") summarized

9  the facts relevant to Petitioner's underlying convictions as follows:

10
11      Mockovak's charges arose from his attempt to hire Russian hitmen to murder Dr.
        Joseph King, his business partner in a chain of Clearly Lasik refractive eye surgery
        centers. Mockovak plotted with Clearly Lasik's information technologies director,
12      Daniel Kultin, to have King and the company's former chief executive officer, Brad
        Klock, murdered. Mockovak did not know Kultin was also working as an informant
13      for the Federal Bureau of Investigation (FBI) and wore a concealed recording
        device during several of their conversations.

14      In late 2008, Mockovak approached Kultin about having Klock murdered. Klock
        had sued Clearly Lasik for wrongful termination, and Mockovak intimated that a
15      person like "Klock would not go far in Russia." [court's footnote: Report of
        Proceedings ("RP") (Jan. 24, 2011) at 118.] Kultin remembers a conversation
16      during this time in which Mockovak referenced Klock's civil case and suggested
        Kultin may have "friends or somebody, . . . some Russian that can just put an end
17      to it . . . rather than the legal way." [court's footnote: Id.] Kultin indicated
        Mockovak made these comments "maybe in a joke way," but not as a "funny joke."
18      [court's footnote: Id.] Mockovak had previously joked with Kultin on several
        occasions about Kultin being in the Russian mafia due to Kultin's Russian accent
19      and daily attire of suits and ties.

20      In early 2009, Mockovak told Kultin that Klock would be traveling to Europe and
        this would be a good opportunity for something to "happen" to Klock. [court's
21      footnote: Id. at 121.] This conversation distressed Kultin, who believed Mockovak
        wanted Klock killed. Kultin then contacted his father, who eventually put him in
22      contact with FBI agent Lawrence Carr.

23

Agent Carr instructed Kultin that he should "never ever bring the subject [of murder] up with [Mockovak] again." [court's footnote: RP (Jan. 20, 2011) at 69-70.] Instead, Kultin should only tell Mockovak he was visiting friends in Los Angeles, including a friend Mockovak believed to be a member of the Russian mafia. This would give them a "better idea of what Dr. Mockovak was thinking." [court's footnote: *Id.* at 73.] Agent Carr further instructed Kultin that if the discussion of his trip to Los Angeles "should spark conversation about murder, that he was not to have any part of that discussion. He was only to listen and to not contribute whatsoever to it." [court's footnote: *Id.*] Over the next two months, Mockovak and Kultin did not discuss the matter.

On August 3, 2009, Mockovak called Kultin and cryptically asked if they could meet to discuss "that thing that we talked about before." [court's footnote: RP (Jan. 24, 2011) at 131.] They met in a parking lot two days later. Mockovak expressed his frustration about Klock's lawsuit and that he wanted something to be "done to him." [court's footnote: *Id.* at 136.] Mockovak also mentioned his partner King had a $4 million life insurance policy if "something were to happen to him" as well. [court's footnote: *Id.* at 134.] Kultin told Mockovak he would "make some calls" to get more information. [court's footnote: *Id.* at 136.]

Mockovak and Kultin met again on August 11, 2009. In a conversation recorded by the FBI, Mockovak answered "yeah" when Kultin told him he had "made some calls" to the hitmen saying Mockovak was interested in killing Klock. [court's footnote: Ex. 54 (Aug. 11, 2009) at 34.] When Kultin told Mockovak "they" could do it, Mockovak replied "Oh good. Good. Good." [court's footnote: *Id.*] Mockovak also answered "yeah" repeatedly when discussing killing methods, but finally laughed, saying "I don't care" when asked how he wanted Klock killed. [court's footnote: *Id.* at 40-41.] Mockovak then initiated a discussion about laundering the money to pay the hitmen and Kultin.

Kultin asked Mockovak if he wanted Klock murdered before his deposition in the lawsuit was completed. Mockovak responded, "No, no, no, no, I want to go ahead and have the deposition happen first." [court's footnote: *Id.* at 43.] Mockovak explained that "[i]f it appeared that Klock would drop his suit, then the murder, which Mockovak described as a purely 'financial thing,' would be unnecessary." [court's footnote: *State v. Mockovak*, noted at 174 Wn.App. 1076, 2013 WL 2181435 at *2.] Mockovak told Kultin that he must make this clear to the hitmen.

The remaining facts of this case were succinctly set forth in Mockovak's direct appeal as follows:

> Kultin next met with Mockovak on October 20, 2009. Kultin again wore a wire. Mockovak first reported that the depositions in Klock's lawsuit had been "outstanding." Mockovak told Kultin that there was nothing urgent about Klock, whom he described as nothing more than a "fly on the wall," but that the situation with King was

different. Mockovak speculated that King was attempting to force him out of the business completely.

Mockovak told Kultin that King would be traveling to Australia in November and showed Kultin the flight information he had discovered during his investigation the previous week. Kultin told Mockovak that the cost of a murder might be less expensive in Australia, which Kultin described as "a wild place." Mockovak replied, "Oh that's good" and "That's what I'm thinking." Kultin said that he would ask his friend whether the murder could be accomplished in Australia. Mockovak told Kultin that he had secreted enough cash to pay for the hit.

On October 21, 2009, Mockovak called his insurance company and requested a copy of the policy on King's life. The policy . . . named Mockovak as the beneficiary.

Kultin and Mockovak met again on October 22, 2009. In this conversation, which was also recorded by the FBI, Kultin told Mockovak that he had spoken to his friend and that "Australia is actually very easy." He told Mockovak that King could be killed "as a robbery" or "as an accident." Mockovak remarked that Australia was far away and that any investigation of King's death would never "come back here ever." Kultin asked whether King's wife, Holly, was also to be killed, and Mockovak told him "no." Mockovak told Kultin that he had been gathering cash and had by that time set aside $11,000. The two men then discussed when the post-murder payment would be required.

. . .

Mockovak and Kultin next met to discuss the details of the plan on November 6, 2009. Mockovak described his attempts to discover additional details of King's travel plans. Mockovak told Kultin that he was trying to sell one of the Canadian surgical centers in anticipation of King's death. He said that he was excited about running the business without interference from King.

Kultin asked Mockovak how he would like the murder to be accomplished. Mockovak proposed that King could be killed while he ran on the beach. When Kultin inquired whether Mockovak would like King's body to be found, Mockovak replied that having the body discovered would be better for purposes of collecting the proceeds of the insurance policy. Mockovak told Kultin that he did not care whether the killers delivered any message to King before

murdering him. Instead, Mockovak explained, "I just want him the fuck out of my way."

Kultin then asked Mockovak whether he had "thought this through," and Mockovak replied that he was a "little uneasy." Kultin asked him whether he was going to "freak out" if the murder occurred, and Mockovak told him that he would not. Mockovak explained that although part of him was uneasy, he did not want to put himself at the mercy of an arbitrator or a judge. He told Kultin that King really "ha[d] this coming." Killing King, Mockovak explained to Kultin, was "the only sure way."

Mockovak and Kultin then discussed how to launder the post-murder payment. Mockovak was concerned that his bank account activity would look suspicious if he were to withdraw a large sum of money shortly before King's death. The two men determined that Mockovak would purchase an expensive (but fake) watch from a jeweler associated with the same criminal organization for which the hit-men were working. Kultin emphasized that the second payment must be made or that both Mockovak and he would be in danger. Mockovak told Kultin that he understood and that he had no desire to get "serious people like this upset."

. . .

Near the end of the conversation Mockovak told Kultin that he had often considered going to the garage of Clearly Lasik and killing King himself. Kultin replied, "don't do that." He told Mockovak that it was a "good thing you came to me because otherwise you would have done it the wrong way."

Mockovak and Kultin agreed to meet the following day near Sea-Tac International Airport in order for Mockovak to deliver the first payment. The conversation concluded with Mockovak reiterating that the choice of Australia for the murder was "almost too good to be true."

On November 7, 2009, Mockovak and Kultin spoke by telephone. Mockovak told Kultin that he had successfully stolen a portrait of King and his family from the Clearly Lasik office in Vancouver, Washington. He told Kultin that he was pleased that they had met on the previous night because it had given him 24 hours to contemplate the murder plan. Mockovak said, "It's absolutely the right thing to do."

That night, Mockovak and Kultin met at a soccer park near the airport. The meeting was recorded by the FBI. The men went into a restroom where, as they had planned, Mockovak gave Kultin $10,000 in cash. Mockovak "wanted to make sure" that he would get his money back in the event that the hit was unsuccessful. Kultin replied that Mockovak would not lose his money.

Mockovak then gave Kultin the photograph of King and his family. He explained that King now had three children and that the children were slightly older than they appeared in the picture. Kultin assured Mockovak that the picture of King's wife would be sufficient for the killers to identify King. Mockovak also gave Kultin a piece of paper on which he had handwritten King's flight information. He told Kultin, "we're ready."

On November 11, 2009, at the direction of the FBI, Kultin called Mockovak and told him that everything was in place for the murder. He explained that the killers had located King in Australia and that they were now watching him. Kultin told Mockovak that he was expecting to hear news of the murder within several days. Mockovak responded, "That sounds good." [court's footnote: *Id.* at *3-5.]

Mockovak was arrested the next day. The State charged him with solicitation to commit first degree murder of King, attempted first degree murder of King, solicitation to commit first degree murder of Klock, conspiracy to commit first degree theft, and attempted first degree theft.

Mockovak retained attorneys Jeffrey Robinson, Colette Tvedt, and Joseph Campagna to defend him against these charges. Robinson was lead counsel and has practiced criminal defense for over 30 years in Washington. The defense team presented an entrapment defense at trial.

A jury acquitted Mockovak of solicitation to murder Klock, but found him guilty of the remaining charges . . . .

(State Court Rec. I, Ex. 2 at 11-17.)

## B.    State Court Procedural History

Petitioner subsequently filed a direct appeal from his judgment and sentence to the Court of Appeals. (State Court Rec. I, Ex. 3.) Pertinent to this federal habeas proceeding, Petitioner raised error regarding:

(1)     whether the entrapment instruction proposed by Petitioner's trial counsel violated Petitioner's due process rights because it misled jurors that an unreasonable amount of persuasion was required to establish the defense;

(2)     whether Petitioner's trial counsel provided ineffective assistance of counsel because he overlooked case law regarding Petitioner's entrapment defense; and

(3)     whether Petitioner's trial counsel's failure to object to the prosecutor's closing argument remarks concerning Petitioner's entrapment defense constituted ineffective assistance of counsel

(*Id.* at 42.) While his direct appeal was pending in the Court of Appeals, Petitioner filed his first personal restraint petition ("PRP") on October 5, 2012. (State Court Rec. II (Dkt. # 43), Ex. 24.) On November 19, 2012, the Court of Appeals stayed Petitioner's first PRP pending resolution of his direct appeal. (*Id.*, Ex. 27.) On May 20, 2013, the Court of Appeals affirmed Petitioner's convictions on direct appeal. (State Court Rec. I, Ex. 7.)

On June 18, 2013, Petitioner sought direct review by the Washington Supreme Court. (State Court Rec. I, Ex. 8.) Relevant to Petitioner's federal habeas petition, Petitioner identified the following issues in his motion for review:

(1)     whether the Washington pattern instruction on entrapment misstates the law by focusing the jury on whether law enforcement used "an unreasonable amount of persuasion,";

(2)     whether Petitioner's trial counsel's conduct was deficient because he proposed the Washington pattern instruction on entrapment;

(3)     whether the Washington pattern instruction on entrapment misstates the law by allowing a prosecutor to argue in closing argument that three elements, rather than two elements, were required to be proved by Petitioner for an entrapment defense; and

(4)     whether Petitioner's trial counsel's conduct was deficient because he failed to object to the prosecutor's closing argument

1    (*Id.* at 383.) The Washington Supreme Court denied review without comment on November 6,

2    2013. (State Court Rec. I, Ex. 16.) On December 4, 2013, the Court of Appeals issued the

3    mandate on Petitioner's direct review. (*Id.*, Ex. 17.)

4      On January 21, 2014, the Court of Appeals lifted its stay on Petitioner's first PRP and

5    directed the State to file a response. (State Court Rec. III (Dkt. # 43-1), Ex. 36.) Relevant to the

6    instant matter, Petitioner raised the following issues in his first PRP:

7      (1) whether Petitioner was denied effective representation due to his trial
     counsel's submission of a proposed jury instruction on entrapment which

8         misstated the law, increased defendant's burden of proving entrapment, and
     by failing to object to the prosecutor's closing argument, which misstated

9         the law of entrapment;

10     (2) whether Petitioner was denied effective representation of counsel due to his
     trial counsel's failure to present evidence that Petitioner suffered from

11        "learned helplessness" and suggestibility

12   (State Court Rec. II, Ex. 24 at 108-10.) In a supplemental petition to his first PRP, Petitioner

13   additionally raised two additional ineffective assistance of counsel claims regarding:

14     (1) whether Petitioner was denied effective assistance of counsel due to his trial
     counsel's failure to use available evidence to impeach Kultin, and

15     (2) whether Petitioner was denied effective assistance of counsel due to the

16        cumulative impact of trial counsel's many acts of deficient conduct

17   (State Court Rec. III, Ex. 37 at 185-186.)

18     On May 8, 2015, the Court of Appeals dismissed the majority of Petitioner's claims in his

19   first PRP, but directed supplemental briefing of whether Petitioner's trial counsel was ineffective

20   for failing to present evidence demonstrating he was particularly vulnerable to entrapment and

21   referred the matter to a panel of three judges for resolution. (State Court Rec. IV (Dkt. # 44), Ex.

22   40.) On June 6, 2016, the Court of Appeals denied Petitioner's first PRP in its entirety and again

23   on reconsideration. (State Court Rec. I, Ex. 2; State Court Rec. IV, Ex. 47.)

Petitioner then sought discretionary review by the Washington Supreme Court on September 7, 2016. (State Court Rec. IV, Ex. 48.) Relevant to Petitioner's federal habeas petition, Petitioner identified the following issues in his motion for review:

(1)     whether deficient performance was established where trial counsel is ignorant of a point of law central to his case and that he failed to perform basic legal research on;

(2)     whether the presumption trial counsel's conduct was within the acceptable range of professional norms was inapplicable because trial counsel did not know the law pertaining to entrapment;

(3)     whether trial counsel's failure to conduct a reasonably thorough factual investigation constituted deficient conduct;

(4)     whether the Court of Appeals' opinion below ignored and contradicted the United States Supreme Court's holding in *Sears v. Upton***,** 561 U.S. 945 (2010*)*; and

(5)     whether the Washington pattern instruction on entrapment misstates the law by requiring proof of an "unreasonable amount of persuasion"

(6)     whether the Washington pattern instruction on entrapment misstates the law by requiring proof of an "unreasonable amount of persuasion"

(*Id.* at 282.) The Washington Supreme Court denied review of Petitioner's first PRP without comment on May 31, 2017. (State Court Rec. IV, Ex. 49.) The Court of Appeals issued the mandate on Petitioner's first PRP on June 23, 2017. (*Id.*, Ex. 50.)

On September 21, 2015, Petitioner filed a second PRP. (State Court Rec. IV, Ex. 51.) In his second PRP, Petitioner sought review of:

(1)     whether Petitioner's Fourteenth Amendment due process right to disclosure of all evidence favorable to the accused was violated because the prosecution failed to disclose exculpatory evidence concerning Kultin's citizenship status; and;

(2)     whether Petitioner was denied his Sixth Amendment right to effective representation due to trial counsel's failure to impeach Kultin with evidence concerning his citizenship status

(*Id.* at 425-26.) On May 6, 2019, the Court of Appeals denied Petitioner's second PRP as an untimely PRP and again on reconsideration. (State Court Rec. V (Dkt. # 44-1), Exs. 62, 66.) On January 24, 2020, the Washington Supreme Court Commissioner denied discretionary review of Petitioner's second PRP, concluding the Court of Appeals properly denied it as time-barred under Washington law. (*Id.*, Ex. 72.) The Court of Appeals issued the mandate on Petitioner's second PRP on April 8, 2020. (*Id.*, Ex. 75.)

### C.    Federal Court Procedural History

On May 9, 2018, Petitioner filed his initial habeas petition with this Court. (Pet. (Dkt. # 1).) On July 11, 2018, Respondent filed a Motion to Stay pending a determination on Petitioner's second PRP. (Resp.'s Mot. (Dkt. # 9).) On July 31, 2018, the Honorable James P. Donohue granted Respondent's Motion to Stay and ordered the parties to provide this Court with a status report of Petitioner's state court proceedings every 90 days. (Order (Dkt. # 10).) The parties filed seven status reports with the Court between October 29, 2018, and April 14, 2020. (Dkt. ## 12, 13, 15, 16, 17, 18, 21.)

On April 14, 2020, Petitioner filed a Motion to "Lift Stay Allowing Petitioner to File Amended Petition, Direct State to Answer, and File State Court Record." (Pet.'s Mot. (Dkt. # 22).) On May 6, 2020, this Court lifted the stay and ordered Petitioner to file an amended habeas petition. (Order (Dkt. # 25).) On June 19, 2020, Petitioner filed his amended habeas petition. (Am. Pet. (Dkt. # 28.)) On July 20, 2020, Respondent filed an Answer and Memorandum of Authorities. (Answer (Dkt. # 29).)

On August 6, 2020, Petitioner filed a Motion for Leave to Conduct Discovery. (Pet.'s Discovery Mot. (Dkt. # 33).) On August 17, 2020, Respondent filed the State Court Record. (State Court Recs. I, II, III, IV, V (Dkt. ## 42-45).) On September 8, 2020, and September 28,

2020, Respondent filed additional supplements to the State Court Record. (State Court Recs. VI, VII, (Dkt. ## 53, 55).) On October 13, 2020, this Court held oral argument on Petitioner's discovery motion. On October 16, 2020, this Court denied Petitioner's discovery motion. (Order (Dkt. # 57).)

On November 3, 2020, Petitioner filed an additional supplement and index to the State Court Record. (State Court Recs. VIII, IX (Dkt. ## 58, 59).) On November 30, 2020, Petitioner filed his traverse. (Traverse (Dkt. # 64).) On December 4, 2020, this Court authorized Respondent to file a reply to Petitioner's traverse. (Order (Dkt. # 65).) On February 4, 2021, Respondent filed his reply. (Resp.'s Reply (Dkt. # 69).) On March 8, 2021, this Court held oral argument on Petitioner's petition. (Dkt. # 72.) This matter is now ripe for review.

### III.    GROUNDS FOR RELIEF

Petitioner identifies the following grounds for relief in his amended habeas petition:

1.    "Violation of Mockovak's Sixth Amendment Right to Effective Assistance of Counsel." (Am. Pet. at 6, 52-56.)

2.    "The giving of a jury instruction that misstated the law or, at best, was materially misleading and likely to confuse the jury." (Am. Pet. at 6, 56-57.)

3.    "Violation of Mockovak's Fourteenth Amendment right to obtain exculpatory information that the Government possessed but failed to provide." (Am. Pet. at 6, 57-58.)

### IV.    DISCUSSION

#### A.    Exhaustion and Procedural Default

Respondent notes in his Answer that Petitioner properly exhausted his first ground for relief, alleging ineffective assistance of counsel, but that Petitioner failed to properly exhaust his second and third grounds for relief because he did not fairly present those issues to the Washington Supreme Court. (Answer at 10, 13-20.) Respondent argues Petitioner's second and

third grounds for relief are therefore procedurally barred under independent and adequate state law. (*Id.*) Petitioner does not dispute that he has procedurally defaulted his second ground for relief but contends his third ground for relief is not procedurally barred from this Court's review. (Traverse at 92-98.)

As discussed below, the Court concludes Petitioner properly exhausted his first ground for relief, but procedurally defaulted his second and third grounds for relief.

### 1.   *Legal Standards*

A state prisoner is required to exhaust all available state court remedies before seeking a federal writ of habeas corpus. 28 U.S.C. § 2254(b)(1). The exhaustion requirement is a matter of comity, intended to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citations and internal quotation marks omitted). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

There are two avenues by which a petitioner may satisfy the exhaustion requirement. First, a petitioner may properly exhaust his state remedies by "fairly presenting" his claim in each appropriate state court, including the state supreme court with powers of discretionary review, giving those courts the opportunity to act on his claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). The petitioner must present the claim to the state's highest court, even where such review is discretionary. *O'Sullivan*, 526 U.S. at 845. "It has to be clear from the petition filed at each level in the state court system that the petitioner is claiming the violation of the federal constitution that the petitioner subsequently claims in the federal habeas petition." *Galvan v. Alaska Dep't of Corrs.*, 397 F.3d 1198, 1204 (9th Cir. 2005).

Consequently, "[i]f a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court." *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996).

Second, a petitioner may technically exhaust his state remedies by demonstrating his "claims are now procedurally barred under [state] law." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (quoting *Castille v. Peoples*, 489 U.S. 436, 351 (1989)). A petitioner's claim is procedurally defaulted where the petitioner fails to comply with a state procedural rule. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S. 722, 729-35 (1991). A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion because "there are no state remedies any longer available to him." *Coleman*, 501 U.S. at 732 (citation and internal quotations omitted).

Federal courts hearing habeas petitions may not review state convictions, even for federal constitutional claims, if the state court's decision procedurally barring the petitioner's claims rests on an "independent and adequate" state law ground. *Coleman*, 501 U.S. at 729. For a state procedural rule to be "independent," the state law ground for the court's decision must not primarily rest on federal law or be interwoven with federal law. *Id.* at 734-35 (citing *Michigan v. Long,* 463 U.S. 1032, 1040-41 (1983)). A state procedural rule is "adequate" if it was "firmly established" and "regularly followed" at the time of the default. *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)).

When a petitioner fails to exhaust his state court remedies, and the court to which petitioner would be required to present his claims in order to satisfy the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for purposes of federal habeas review. *See Coleman*, 501 U.S. at 735 n.1. In such instances, federal habeas

1   review of the claims is barred unless the prisoner can demonstrate "cause for the default and

2   actual prejudice as a result of the alleged violation of federal law, or demonstrate failure to

3   consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750.

4        2.   *Analysis*

5        Here, the Court concludes that it may properly consider Petitioner's first ground for

6   relief, but that Petitioner has procedurally defaulted his second and third grounds for relief.

7   Therefore, the Court recommends that Petitioner's second and third grounds for federal habeas

8   relief be denied for the reasons explained below.

9        i.   <u>Ground 2 – Entrapment Jury Instruction Claim</u>

10       Petitioner's second ground for relief argues the trial court gave a misleading jury

11  instruction on entrapment and relieved the State of its burden of proof in violation of Petitioner's

12  Fourteenth Amendment due process rights under *Boyde v. California*, 494 U.S. 370 (1994). (Am.

13  Pet. at 9, 56-57.) Respondent counters that Petitioner failed to fairly present this claim to the

14  Washington Supreme Court as a federal claim, and therefore, this claim is procedurally barred on

15  federal habeas review. (Answer at 15-16.) Petitioner failed to dispute Respondent's position in

16  his traverse or at oral argument.

17       Based on the procedural record before the Court, Petitioner did not fairly present his

18  second ground for relief to the Washington Supreme Court as a federal claim on direct appeal or

19  state collateral review. On direct appeal, it is clear from the record that Petitioner failed to

20  specify that his jury instruction claim raised a federal issue in his petition for discretionary

21  review filed in the Washington Supreme Court. (*See* State Court Rec. I, Ex. 8 at 383.) Instead,

22  Petitioner presented the jury instruction claim to the Washington Supreme Court as an issue of

23  state law citing only state cases. (*See id.* at 393-94.) In addition, Petitioner failed to present his

1    second ground for relief as a federal issue on state collateral review. Petitioner's first PRP

2    alleged trial counsel provided ineffective assistance of counsel by proposing the jury instruction

3    but Petitioner failed to raise a claim directly challenging the jury instruction itself. (*See* State

4    Court Rec. II, Ex. 24 at 108-10.) In his motion for discretionary review, Petitioner argued that

5    the Washington Supreme Court should resolve the issue of whether an entrapment jury

6    instruction properly includes an objective element, but Petitioner's motion exclusively relied on

7    Washington state law and did not present the issue as a federal claim. (*See* State Court Rec. IV,

8    Ex. 48 at 281-82, 310-312.)

9        Given his failure to fairly present his jury instruction claim as a federal claim to the

10   Washington Supreme Court, Petitioner has technically exhausted, but procedurally defaulted, his

11   second ground of relief. RCW 10.73.090(1) provides that a petition for collateral attack on a

12   judgment and sentence in a criminal case must be filed within one year after the judgment

13   becomes final. A petitioner has one year from the date the Court of Appeals issues the mandate

14   to file a timely challenge. RCW 10.73.090(3)(b).

15       Here, the Court of Appeals issued the mandate on Petitioner's direct appeal on December

16   4, 2013, and thus, Petitioner's time to file a timely collateral challenge on his second ground for

17   relief making a federal law challenge has long passed. (State Court Rec. I, Ex. 17.) Therefore,

18   Petitioner would be time barred from returning to the state courts to present a challenge to the

19   jury instruction pursuant to federal law. *See* RCW 10.73.090; *Coleman*, 501 U.S. at 735 n.1.

20   Moreover, because Petitioner has previously filed two PRPs in the Court of Appeals, the state

21   courts are unlikely to entertain another such petition. *See* RCW 10.73.140 (successive petition

22   bar). The Court therefore concludes Petitioner has technically exhausted, but procedurally

23   defaulted, his second ground for relief.

1    Because the Court concludes Petitioner's second ground for relief appears to be

2    procedurally defaulted, the Court may only review Petitioner's claim if he shows "cause and

3    prejudice" for the default or that failure to consider the claim will result in a fundamental

4    miscarriage of justice. *See Coleman*, 501 U.S. at 750. Petitioner failed to show cause or prejudice

5    for his default on his second ground for relief in his traverse or at oral argument, nor does he

6    make any showing that failure to consider this claim will result in a fundamental miscarriage of

7    justice. Accordingly, the Court recommends Petitioner's habeas petition be denied as to his

8    second ground for relief.

9                    ii.    Ground 3 – Exculpatory Evidence Claim

10    Petitioner's third ground for relief alleges the prosecution failed to disclose exculpatory

11    evidence regarding Kultin in violation of his Fourteenth Amendment right to due process under

12    *Giglio v. United States*, 405 U.S. 150 (1972) and *United States v. Bagley*, 473 U.S. 667 (1985).

13    (Am. Pet. at 10-11, 57-58.) Petitioner generally alleges Kultin testified against Petitioner to gain

14    favor with his citizenship application and that evidence relating to Kultin's motivation to testify

15    was not disclosed to Petitioner's trial counsel. (*Id.*) Respondent argues Petitioner's third claim is

16    procedurally barred on federal habeas review because Petitioner's counsel failed to timely file a

17    PRP raising this issue. (Answer at 16-20; Resp.'s Reply at 37-40.) Specifically, Respondent cites

18    the Court of Appeals' determination that Petitioner failed to file his second PRP within the

19    one-year period required by RCW 10.73.090. (*Id.*; *see* State Court Rec. V, Ex. 62 at 155-163, Ex.

20    72 at 468-71.)

21    Here, as previously outlined by this Court in its decision denying Petitioner's motion for

22    discovery regarding this issue, Petitioner procedurally defaulted this claim because he failed to

23    raise the basis of his third ground for relief in a timely PRP to the Court of Appeals. (*See* Order

(Dkt. # 57) at 4-6.) Petitioner attempted to obtain information on this claim for his state collateral proceedings by requesting documents pursuant to a Washington Public Records Act action in November 2013. (Am. Pet at 42-43.) Based on this request, the King County Prosecuting Attorney's Office eventually produced redacted documents from September 2014 through October 29, 2014. (*Id.* at 44.) Petitioner's deadline to file a PRP raising the exculpatory evidence issue for state collateral review was December 4, 2014. (*See* State Court Rec. V, Ex. 62 at 152.) Despite this deadline, Petitioner waited until September 21, 2015, to file a second PRP raising the claim. (State Court Rec. IV, Ex. 51 at 425-26.) As a result, the Court of Appeals denied Petitioner's second PRP as untimely. (*Id.*, Ex. 62 at 155-163, Ex. 66.) The Washington Supreme Court similarly concluded Petitioner's second PRP was time-barred under RCW 10.73.090 upon its review. (*Id.*, Ex. 72 at 468-71.) The Ninth Circuit has previously recognized that RCW 10.73.090 provides an independent and adequate state procedural ground to bar federal habeas review. *See Casey v. Moore*, 386 F.3d 896, 920 (9th Cir. 2004); *Shumway v. Payne*, 223 F.3d 982, 989 (9th Cir. 2000). As such, Petitioner technically exhausted, and procedurally defaulted, his third ground for relief because the time bar functions as an independent and adequate state procedural law barring review of this claim in federal court.

Federal habeas review of a procedurally defaulted claim is barred unless Petitioner can demonstrate cause and prejudice, or a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. To satisfy the "cause" prong of the cause and prejudice standard, Petitioner must show that some objective factor external to the defense prevented him from complying with the state's procedural rule. *Id.* at 753; *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (a petitioner can demonstrate "cause" if he shows constitutionally ineffective assistance of counsel, the unavailability of a factual or legal basis for a claim, or some interference by officials). To show

1    "prejudice," Petitioner "must shoulder the burden of showing, not merely that the errors at his

2    trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial

3    disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v.*

4    *Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). In addition, in a "truly extraordinary

5    case," the Court may grant federal habeas relief without a showing of cause or prejudice to

6    correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the

7    conviction of a defendant who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 338 (1995).

8        Petitioner argues cause and prejudice exists to excuse the procedural default because the

9    prosecution failed to disclose impeachment evidence to Petitioner's trial counsel, and that this

10   alleged *Giglio* violation in itself constitutes cause and prejudice to lift the procedural default.

11   (Traverse at 92-98.) Petitioner argues that whenever a habeas petitioner demonstrates a *Giglio*

12   violation has occurred, then any state court procedural default is excused and the claim is

13   cognizable in federal court pursuant to *Banks v. Dretke*, 540 U.S. 668 (2004). (*Id.* at 94-95.)

14   Petitioner additionally argues the Court of Appeals never ruled on the merits of his *Giglio* claim

15   so it remains properly before this Court. (*Id.* at 93-94.) Respondent counters that Petitioner fails

16   to demonstrate either cause or prejudice exist to excuse the procedural default because

17   Petitioner's counsel is the reason why an untimely PRP raising the issue was ultimately filed in

18   the Court of Appeals. (Answer at 20; Resp.'s Reply at 38-39.)

19       Petitioner's argument misses the mark. Here, Petitioner fails to demonstrate a factor

20   external to the defense prevented him from complying with the state's procedural rules to show

21   cause exists to lift the procedural default. Petitioner's counsel previously noted he failed to

22   timely file the second PRP because his review of the records provided by the King County

23   Prosecutor's Office was not complete by the filing deadline. (*See* Pet.'s Discovery Mot. at 8.)

Furthermore, Petitioner's cited authority is completely inapposite to this issue because the prosecution's alleged suppression of evidence regarding Kultin was not the reason Petitioner was unable to timely raise his claim on state collateral review. *See Henry v. Ryan*, 720 F.3d 1073, 1082-83 (9th Cir. 2013) ("[T]he state's suppression establishes cause only when it is the *reason* for [Petitioner's] failure to develop facts in state court proceedings.") (citing *Banks*, 540 U.S. at 691); *see also Woods v. Sinclair*, 764 F.3d 1109, 1130-31 (9th Cir. 2014). Thus, Petitioner's counsel's choice on when to file the second PRP, and not any actions of the State, resulted in Petitioner's procedural default on this issue.

Because Petitioner has not met his burden of demonstrating cause for his procedural default, the Court need not determine whether there was any actual prejudice. *See Cavanaugh v. Kincheloe*, 877 F.2d 1443, 1448 (9th Cir. 1989) (citing *Smith v. Murray*, 477 U.S. 527, 533 (1986)). Accordingly, Petitioner fails to demonstrate his procedurally defaulted claim under his third ground for relief is eligible for federal habeas review, and therefore, the Court recommends that Petitioner's third ground for relief be denied.

## B.    Section 2254 Merits Review

### 1.    *Federal Habeas Standard, 28 U.S.C. § 2254*

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), federal habeas corpus relief is available only to a person "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if: (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). In considering

1   claims pursuant to § 2254(d), the Court is limited to the record before the state court that

2   adjudicated the claim on the merits, and the petitioner carries the burden of proof. *Cullen v.*

3   *Pinholster*, 563 U.S. 170, 181-82 (2011); *see also Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th

4   Cir. 2013). "When more than one state court has adjudicated a claim, [the Court analyzes] the

5   last reasoned decision." *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005) (citing *Ylst v.*

6   *Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

7         Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

8   only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

9   question of law, or if the state court decides a case differently than the Supreme Court has on a

10  set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

11  Under the "unreasonable application" clause, a federal habeas court may grant the habeas

12  petition only if the state court identifies the correct governing legal principle from the Supreme

13  Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at

14  407-09. The Supreme Court has made clear that a state court's decision may be overturned only

15  if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The

16  Supreme Court has further explained that "[a] state court's determination that a claim lacks merit

17  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

18  of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting

19  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

20        Clearly established federal law, for purposes of AEDPA, means "the governing legal

21  principle or principles set forth by the Supreme Court at the time the state court render[ed] its

22  decision." *Lockyer*, 538 U.S. at 71-72. This includes the Supreme Court's holdings, not its dicta.

23  *Id.* "If no Supreme Court precedent creates clearly established federal law relating to the legal

1   issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or

2   an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952,

3   955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

4         With respect to § 2254(d)(2), a petitioner may only obtain relief by showing that the state

5   court's conclusion was based on "an unreasonable determination of the facts in light of the

6   evidence presented in the state court proceeding." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)

7   (quoting 28 U.S.C. § 2254(d)(2)); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A]

8   decision adjudicated on the merits in a state court and based on a factual determination will not

9   be overturned on factual grounds unless objectively unreasonable in light of the evidence

10   presented in the state-court proceedings."). The Court presumes the state court's factual findings

11   to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing

12   evidence." *Dretke*, 545 U.S. at 240 (quoting 28 U.S.C. § 2254(e)(1)).

13             *2.       Ground 1 – Ineffective Assistance of Counsel*

14         Petitioner's first ground for relief in his amended habeas petition globally alleges he was

15   denied his Sixth Amendment Right to effective assistance of trial counsel. The Sixth Amendment

16   guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v.*

17   *Washington*, 466 U.S. 668 (1984). "The essence of an ineffective-assistance claim is that

18   counsel's unprofessional errors so upset the adversarial balance between defense and prosecution

19   that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477

20   U.S. 365, 374 (1986). Claims of ineffective assistance of counsel are evaluated under the

21   two-prong test set forth in *Strickland*. Under *Strickland*, a defendant must prove that: (1)

22   counsel's performance was deficient; and (2) the deficient performance prejudiced the defense.

23   466 U.S. at 687.

1    Under the first prong of the *Strickland* test, a petitioner must show that counsel's

2    performance fell below an objective standard of reasonableness. 466 U.S. at 688. Judicial

3    scrutiny of counsel's performance must be highly deferential. *Id.* at 689. The Ninth Circuit has

4    previously recognized that "'[a] fair assessment of attorney performance requires that every

5    effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

6    counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

7    time.'" *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at

8    689).

9    The second prong of the *Strickland* test requires a showing of actual prejudice related to

10   counsel's performance. In order to establish prejudice, a petitioner "must show that there is a

11   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

12   would have been different. A reasonable probability is a probability sufficient to undermine

13   confidence in the outcome." *Strickland*, 466 U.S. at 694. The reviewing court need not address

14   both components of the inquiry if an insufficient showing is made on one component. *Id.* at 697.

15   Furthermore, the second prong "requires a 'substantial,' not just 'conceivable,' likelihood of a

16   different result." *Pinholster*, 563 U.S. at 189 (quoting *Harrington*, 562 U.S. at 104).

17   While the Supreme Court established in *Strickland* the legal principles that govern claims

18   of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate

19   whether defense counsel's performance fell below the *Strickland* standard. *Harrington*, 562 U.S.

20   at 101. Where a state court rejected an ineffectiveness claim on the merits, the "pivotal question"

21   in a § 2254 proceeding "is whether the state court's application of the *Strickland* standard was

22   unreasonable." *Id.* Therefore, the Court employs a "'doubly deferential'" review, taking a

23   "'highly deferential' look at counsel's performance and through the 'deferential lens of

1   2254(d).'" *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 566 U.S. 111, 123

2   (2009)). As such, the petitioner "must demonstrate that it was necessarily unreasonable" for the

3   state court to rule as it did. *Id.*

4        Between his amended petition and the submission of his traverse, Petitioner has identified

5   and argued several separate and distinct ineffective assistance of counsel claims under his first

6   ground for relief. (*See* Am. Pet at 6-9, 52-56; Traverse at 2-6.) Petitioner submits each individual

7   act of deficient conduct caused prejudice by itself, and, in the alternative, that *Strickland*

8   prejudice resulted from the cumulative effect of his trial counsel's multiple deficiencies. (Am.

9   Pet. at 56.)

10       Petitioner asserts in his amended petition that the Court of Appeals' determination with

11  respect to the following ineffective assistance of counsel claims is contrary to, and an

12  unreasonable application of *Hinton v. Alabama*, 571 U.S. 263 (2014), *Sears v. Upton*, 561 U.S.

13  945 (2010), and *Strickland*:

14      (1)    Trial counsel failed to present psychological evidence of learned
15          helplessness, heightened suggestibility and heightened fear responses
         because he erroneously believed that under Washington law if he presented
16         such evidence, he would not be allowed to argue the defense of entrapment.

17      (2)    Trial counsel proposed a legally incorrect jury instruction that purported to
         define the statutory defense of entrapment set forth in RCW 9A.16.070. At
18         the request of Mockovak's trial counsel, the trial court judge gave this
         erroneous instruction to the jury as Instruction No. 29. This instruction
19         misstated the law by failing to apprise the jury that the test for entrapment
         was a subjective test. The instruction also created the erroneous impression
20         that the test for entrapment was an objective test.

21      (3)    By combining statements as [to] what constituted entrapment and what did
         not constitute entrapment, the instruction was susceptible to the
22         construction that the defendant (Mockovak) carried the burden of proving
         three elements in order to prove entrapment. This made Mockovak's burden
23         to prove entrapment more onerous than it actually was because in
         Washington entrapment is defined by statute (RCW 9A.16.070) as having
         only two elements. There is a reasonable likelihood that anyone reading this

instruction would erroneously conclude that entrapment had three elements and would not consider relevant evidence of entrapment.

(4)    In closing argument the trial prosecutor told the jury that Mockovak had to prove three elements of entrapment in order to establish the defense, when in fact it is settled law that the defense of entrapment has only two elements.

(5)    Trial counsel failed to object to the prosecutor's closing argument when the prosecutor misinformed the jury that entrapment had three elements and further misinformed the jury that Mockovak had to prove that law enforcement used an unreasonable amount of persuasion to overcome his reluctance to solicit a murder. The prosecutor's erroneous statement of the law makes it a virtual certainty that the jury misconstrued the jury instruction.

(6)    Because trial counsel did not know that under Washington law the test for entrapment was subjective, he failed to investigate the effect that long-term childhood sex abuse had on Mockovak's mental state and vulnerability to inducement to commit illegal acts. Trial counsel failed to consult an expert on childhood sex abuse and failed to have Mockovak examined by an expert familiar with the continuing psychological and neurological effects of childhood sex abuse.

(7)    Trial counsel failed to present evidence at trial that (i) Mockovak was a victim of long-term childhood sex abuse and (ii) that such abuse caused Mockovak to develop Major Depressive Disorder, PTSD, and learned helplessness and susceptibility to suggestion, thereby making Mockovak more vulnerable to Kultin's inducement.

(8)    Trial counsel failed to impeach Kultin with readily available evidence that, contrary to Kultin's contention that he did not know prosecution witness Klock well, Kultin actually worked for Klock. In addition, Kultin had examined Klock's own personal computer. At trial Kultin accused Mockovak of spying into Klock's computer, and Kultin suggested that the only way that Mockovak could know things about Klock was because Mockovak was spying on Klock through Klock's computer. There was readily available evidence that Kultin had complete access to Klock's computer and that Kultin – not Mockovak – was the one with access to Klock's private information, such as Klock's planned trip to Europe, but Mockovak's trial counsel did not use that information to impeach Kultin.

(9)    Trial counsel failed to investigate the subject of Kultin's arrest by INS; failed to investigate the INS "charges" that were brought against Kultin and then later dismissed; failed to investigate how Kultin gained admission to the United States; failed to investigate whether Kultin had an application for citizenship pending; failed to investigate whether Kultin had previously

had an application for citizenship rejected; failed to investigate whether Kultin intended to apply for citizenship after he finished testifying for the prosecution at trial; and failed to investigate whether Kultin asked for, was offered, or received assistance or help in connection with his immigration status and efforts to obtain U.S. citizenship.

(10)    Trial counsel failed to cross examine Kultin about his INS arrest, about Kultin's alleged asylum status, about Kultin's motives to curry favor with law enforcement, or about law enforcement's offers to provide assistance and "great help" to Kultin. Trial counsel would have known about those topics for possible impeachment if trial counsel had investigated Kultin's legal status as a resident alien.

(11)    In support of the statutory mitigating factor of a "failed defense" of entrapment, trial counsel failed to have a psychologist test Mockovak for impairments caused by years of childhood sex abuse, such as Major Depressive Disorder, PTSD, and learned helplessness.

(12)    Trial counsel failed to have Mockovak evaluated by a forensic psychologist such as Dr. Natalie Novick-Brown. Had he done so, he would have been able to present evidence that Mockovak was profoundly psychologically impaired. Trial counsel also failed to argue at sentencing that Kultin had motives to lie and to curry favor with federal officials so that he could avoid deportation or prosecution for making a false claim of a need for asylum and so that he could obtain U.S. citizenship.

(Am. Pet at 52-56.) Petitioner additionally asserts the Court of Appeals' decision was based on two unreasonable findings of fact under 28 U.S.C. § 2254(d)(2). (*Id.* at 61-62.)

In his traverse, Petitioner further elaborates that the issues presented under his first ground for relief for this Court's review are:

(1)    The Court of Appeals' ruling that trial counsel's failure to understand the entrapment defense presented at trial was not deficient conduct is directly contrary to the Supreme Court's decisions in *Hinton v. Alabama*, 571 U.S. 263 (2014); *Williams v. Taylor*, 529 U.S. 362 (2000); and *Strickland v. Washington*, 466 U.S. 668 (1984). (Traverse at 2, 35-49.)

(2)    The Court of Appeals' ruling that trial counsel's decision not to investigate facts regarding Petitioner's neurological defects and psychological impairments was not deficient conduct is directly contrary to the Supreme Court's decisions in *Wiggins v. Smith*, 539 U.S. 510 (2003), *Williams*, and *Strickland*, which all hold counsel's strategic trial decisions are irrelevant

to the question of deficient conduct if counsel's investigation was unreasonable in the first instance. (Traverse at 2-3, 49-59.)

(3)    The Court of Appeals' ruling that Petitioner was not prejudiced by trial counsel's decision not to investigate Petitioner's neurological defects and psychological impairments from previous childhood sexual abuse because trial counsel presented evidence in support of the entrapment defense is directly contrary to the Supreme Court's decision in *Sears v. Upton*, 561 U.S. 945 (2010). (Traverse at 3, 59-60.)

(4)    The Court of Appeals' ruling that Petitioner failed to establish prejudice resulting from trial counsel's failure to investigate because the prosecution presented sufficient evidence to support jury's verdict rejecting the entrapment defense is directly contrary to the Supreme Court's decisions in *Wiggins*, *Williams*, and *Strickland*. (Traverse at 3, 49-59.)

(5)    The Court of Appeals' direct appeal determination that Petitioner was not prejudiced by trial counsel's decision not to object to the prosecutor's statement of entrapment defense during closing argument was an unreasonable application of *Strickland*. (Traverse at 4-5, 61-67.)

(6)    The Court of Appeals' decision was based on two objectively unreasonable findings of fact. (Traverse at 5-6, 67-82.) First, the Court of Appeals erroneously found Petitioner failed to cite any case that would have alerted trial counsel to the fact that his proposed jury instruction on entrapment was flawed. Petitioner notes he cited such a case: *State v. Lively*, 130 Wn.2d 1, (1996). (*Id.* at 68-73.) Second, the Court of Appeals erroneously determined Petitioner raised argument that jury instruction failed to inform jury inducement prong of entrapment defense must be determined using a "subjective" approach rather than an "objective" standard for first time at oral argument, but Petitioner asserts he raised argument in his briefing. (*Id.* at 72-74.)

(7)    The Court of Appeals' procedure for determining the facts pertinent to Petitioner's ineffective assistance of counsel claim was inadequate because it twice refused to consider declarations submitted in support of Petitioner's personal restraint petitions. Two of these declarations were from Petitioner's trial counsel and one was from an experienced criminal defense attorney familiar with the entrapment defense under Washington law. (Traverse at 74-82.)

For purposes of this Report and Recommendation, the Court reframes and determines each of Petitioner's separate ineffective assistance of counsel claims raised under his first ground for relief as follows:

1              i.      Ground 1A: Entrapment Jury Instruction

2           First, Petitioner asserts his trial counsel rendered ineffective assistance of counsel by

3   proposing an incorrect jury instruction on the defense of entrapment. (Am. Pet at 53-54; Traverse

4   at 2, 35-49.) In his traverse, Petitioner extensively elaborates that the Court of Appeals

5   adjudication regarding the entrapment jury instruction is contrary to the Supreme Court's

6   decisions in *Hinton*, *Williams*, and *Strickland*. (Traverse at 35-49.) Pursuant to those cases,

7   Petitioner argues that his trial counsel had a duty to make a reasonable investigation into the

8   requirements of an entrapment defense and that Petitioner's trial counsel's "failure to learn the

9   law" is in and of itself deficient performance. (*See id.*)

10          Respondent argues that the Court of Appeals correctly determined the entrapment jury

11  instruction was proper under Washington law, and in light of that state court determination,

12  Petitioner cannot demonstrate his trial counsel's proposal of the instruction was ineffective.

13  (Answer at 26-31.) Respondent argues the Court of Appeals properly interpreted the *Strickland*

14  standard in finding that a trial counsel's misunderstanding of the law constitutes deficient

15  representation only if trial counsel's misunderstanding adversely affects counsel's performance.

16  (Resp.'s Reply at 4-7.) Therefore, Respondent argues, the Court of Appeals correctly determined

17  trial counsel did not provide deficient representation because any misunderstanding he may have

18  had did not result in any acts or omissions adverse to Petitioner's defense. (*Id.* at 7-10.)

19          The Court of Appeals, on direct appeal, concluded trial counsel's decision to propose the

20  entrapment instruction was not deficient representation. (State Court Rec. I, Ex. 7 at 353-58.) On

21  this issue, the Court of Appeals concluded:

22          In this case, the entrapment instruction proposed by Mockovak's attorney and given
            by the trial court was identical to that set forth in Washington Pattern Jury
23          Instruction (WPIC) 18.05. [court's footnote omitted.] The entrapment instruction
            stated:

> Entrapment is a defense to each of the charges in this case if the criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and Michael Mockovak was lured or induced to commit a crime that he had not otherwise intended to commit.
>
> The defense is not established if the law enforcement officials did no more than afford Michael Mockovak an opportunity to commit a crime. The use of a reasonable amount of persuasion to overcome reluctance does not constitute entrapment.
>
> Michael Mockovak has the burden of proving this defense by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that Michael Mockovak has established this defense, it will be your duty to return a verdict of not guilty.

Mockovak contends that the second sentence of the second paragraph of this instruction—stating that "[t]he use of a reasonable amount of persuasion to overcome reluctance does not constitute entrapment"—is not a component of an entrapment defense. Although an identical statement appears in WPIC 18.05, Mockovak nevertheless contends that it was deficient performance for his attorney to propose it.

Where there is no case law indicating that a pattern jury instruction misstates the law, it is not deficient performance for defense counsel to propose such an instruction. *Studd*, 137 Wn.2d at 551. Our Supreme Court has explained that in such circumstances, "counsel can hardly be faulted for requesting a jury instruction based upon a then-unquestioned [pattern jury instruction]." *Studd*, 137 Wn.2d at 551. On the other hand, where existing case law indicates that a pattern jury instruction is flawed, counsel's failure to "research or apply relevant law" may constitute deficient performance. *State v. Kyllo*, 166 Wn.2d 856, 868–69, 215 P.3d 177 (2009).

Here, Mockovak fails to identify any decision by a court in our state indicating that—at the time of his trial—WPIC 18.05 was an incorrect statement of the law of entrapment. We most recently addressed this instruction in *State v. O'Neill*, 91 Wn. App. 978, 967 P.2d 985 (1998). In that case, the government agent was a corrupt police officer who was illegally soliciting a bribe for his own personal benefit, not an undercover officer investigating a crime. *O'Neill*, 91 Wn. App. at 982–83. In such circumstances, we concluded, no amount of persuasion by the officer would be reasonable and, accordingly, a jury instruction indicating that "a reasonable amount of persuasion to overcome reluctance does not constitute entrapment" was improper. *O'Neill*, 91 Wn. App. at 982. We noted, however, that "[t]he 'reasonable

amount of persuasion to overcome reluctance' language is clearly designed for the typical undercover or sting operation." *O'Neill*, 91 Wn. App. at 990. Accordingly, we explained, such an instruction is "perfectly appropriate in the normal entrapment case." *O'Neill*, 91 Wn. App. at 990. [court's footnote: The WPIC commentary, citing to *O'Neill*, indicates that the law of entrapment in bribery cases requires special analysis. WPIC 18.05.]

This statement in *O'Neill*, of course, would hardly alert defense counsel that "the reasonable amount of persuasion" language of WPIC 18.05 was improper in the circumstances presented. Instead, our discussion in *O'Neill* would inform counsel that this language is properly utilized in cases involving a "typical undercover or sting operation." 91 Wn. App. at 990. The case against Mockovak was built through precisely such an operation and, accordingly, counsel cannot be faulted for proposing an instruction that, as we noted, is "perfectly appropriate" in such circumstances.

. . .

Because there was no case law at the time of Mockovak's trial indicating that WPIC 18.05 contained an incorrect statement of the law, defense counsel did not provide ineffective assistance by proposing an instruction based upon this pattern jury instruction. [court's footnote omitted.] *See Studd*, 137 Wn.2d at 551. Defense counsel's performance did not fall "below an objective standard of reasonableness based on consideration of all the circumstances," *McFarland*, 127 Wn.2d at 334-35, and, accordingly, Mockovak's ineffective assistance of counsel claim fails. [court's footnote omitted.]

(State Court Rec. I, Ex. 7 at 353-58.)

Here, Petitioner fails to demonstrate the Court of Appeals' decision regarding the entrapment jury instruction was contrary to established Supreme Court precedent. First, the Court of Appeals' decision involved an extensive interpretation of Washington law to determine whether the entrapment instruction stated the appropriate standard. (*See* State Court Rec. I, Ex. 7 at 353-58.) A state court's interpretation of state law is binding on a federal habeas court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). Because the state court concluded the entrapment jury instruction requested by Petitioner's counsel was correct

1  under Washington law, Petitioner's ineffective assistance of counsel claim on the instruction

2  itself fails to demonstrate that his trial counsel's performance was deficient or that he was

3  prejudiced on this basis.

4      Second, even assuming Petitioner's trial counsel had some form of a subjective

5  misunderstanding of entrapment law, the Court of Appeals correctly determined Petitioner's trial

6  counsel did not provide deficient representation. (*See* State Court Rec. I, Ex. 7 at 358.) It is clear

7  under the *Strickland* standard that trial counsel does not provide deficient representation unless

8  his misunderstanding resulted in acts or omissions adverse to Petitioner's defense. *See*

9  *Harrington*, 562 U.S. at 110 (citing *Strickland*, 466 U.S. at 688) ("*Strickland* . . . calls for an

10  inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state

11  of mind."). Petitioner elaborates at length on several Supreme Court cases he believes

12  demonstrate the Court of Appeals' decision was contrary to clearly established Supreme Court

13  precedent based on Petitioner's trial counsel's misunderstanding of the entrapment defense and

14  failure to investigate the law. (*See* Traverse at 35-49.) However, upon the Court's review of

15  Petitioner's submitted cases, the Court finds Petitioner's submitted cases do not meaningfully

16  depart from the Court of Appeals' analysis of this issue under the *Strickland* standard. Because

17  the provided jury instruction was a correct articulation of the entrapment defense under

18  Washington law, Petitioner fails to demonstrate an objective act of trial counsel resulted in

19  deficient performance.

20      Related to this issue, Petitioner alleges that the entrapment instruction also misstated

21  Washington law by failing to apprise the jury that entrapment involves a subjective, and not an

22  objective, standard. (Am. Pet. at 53-54.) The Court of Appeals declined to consider this

23  argument on direct appeal because Petitioner raised it for the first time at oral argument. (State

REPORT AND RECOMMENDATION - 30

Court Rec. I, Ex. 7 at 357 n.9.) However, the Court of Appeals rejected the argument when Petitioner raised the issue again in its first order on his PRP:

> Mockovak argues that reconsideration is necessary based on *State v. Lively*, 130 Wn.2d 1, 921 P.2d 1035 (1996). He contends that *Lively* holds that a jury may only consider a defendant's subjective state of mind in determining whether the defendant has been entrapped, and that the instruction is erroneous because it includes an objective component: the conduct of the State to induce or entice the defendant. But *Lively* states merely that the focus of the defense is the defendant's mental state. It did not hold that objective elements may not be considered. [court's footnote: "While it is true that in cases involving entrapment the State's action is integrally involved, predisposition of the defendant is the focal element of the defense." *Lively*, 130 Wn.2d at 13.] Mockovak fails to establish that this claim warrants reconsideration.

(State Court Rec. IV, Ex. 40 at 10-11.) The Court of Appeals reaffirmed the jury instruction provided by the trial court contained both objective and subjective standards in its ultimate adjudication of Petitioner's first PRP. (State Court Rec. I, Ex. 2 at 22-23 ("The entrapment instruction proposed by the defense and given to the jury contained both objective and subjective elements and correctly states the law . . . .").

Similarly, on this aspect of his claim, Petitioner fails to demonstrate the Court of Appeals' decision regarding his trial counsel's providing of the entrapment jury instruction was contrary to established Supreme Court precedent. Because the state court concluded the entrapment instruction requested by Petitioner's counsel was appropriate under Washington law, Petitioner's ineffective assistance of counsel claim necessarily fails on this basis. Therefore, Petitioner's petition should be denied with respect to this claim for relief.

    ii.    <u>Ground 1B: Trial Counsel's Failure to Investigate re: Petitioner's Neurological Defects and Psychological Impairments</u>

Petitioner next makes several arguments contending the Court of Appeals applied a rule contrary to clearly established Supreme Court precedent when it rejected his claim that his trial counsel inadequately investigated, and misunderstood, a defense premised upon Petitioner's

1   neurological defects and psychological impairments from childhood sexual abuse. (Am. Pet. at

2   52-56.) For ineffective assistance of counsel claims, defense counsel has a "duty to make

3   reasonable investigations or to make a reasonable decision that makes particular investigations

4   unnecessary." *Strickland*, 466 U.S. at 691. Nevertheless, the Court must give deference to

5   defense counsel's tactical trial decisions, which are decisions normally left to counsel's best

6   judgment. *Id.* at 689 ("[T]he defendant must overcome the presumption that, under the

7   circumstances, the challenged action might be considered sound trial strategy."); s*ee Brown v.*

8   *Uttecht*, 530 F.3d 1031, 1035 (9th Cir. 2008); *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000).

9   To that end, trial counsel is "'strongly presumed to have rendered adequate assistance and made

10  all significant decision in the exercise of reasonable professional judgment.'" *Pinholster*, 563

11  U.S. at 189 (quoting *Strickland*, 466 U.S. at 690).

12          Specifically, on the issues related to this ground, Petitioner contends that his trial counsel:

13  (1) failed to present evidence that Petitioner was sexually abused as a child: (2) failed to

14  investigate psychological and neurological effects of his childhood sex abuse; and (3) failed to

15  present psychological evidence of "learned helplessness, heightened suggestibility and

16  heightened fear responses" all because counsel erroneously believed that if he did so, he would

17  not be allowed to present an entrapment defense. (Am. Pet. at 52-54.) Petitioner argues the Court

18  of Appeals' ruling on this issue was thus contrary to the Supreme Court's decisions in *Wiggins*,

19  *Williams*, *and Strickland*, and those decisions determinations of deficient performance and

20  prejudice, because of his counsel's failure to investigate. (Am. Pet at 52, 54-56; Traverse at 2-4,

21  49-59.) Respondent counters Petitioner's arguments fail to prove the Court of Appeals'

22  adjudication was unreasonable, or give proper deference to trial counsel's strategic decisions,

23

considering presentation of such evidence would have opened the door to other evidence harmful

to Petitioner's defense. (Answer at 32-36.)

The Court of Appeals rejected Petitioner's failure to investigate claim in adjudicating

Petitioner's first PRP. (State Court Rec. I, Ex. 2 at 19-25.) On this aspect, the Court of Appeals

held:

> Mockovak contends his trial counsel's failure to buttress his entrapment defense
> with expert testimony regarding his "learned helplessness" was deficient
> performance. He alleges a psychologist told his counsel prior to trial that he had
> been sexually abused for years and had a "history of being easily manipulated and
> exploited." [court's footnote: Gonsiorek Decl. at 2, ¶ 5.] The psychologist
> explained that "people who are repeatedly sexually abused as a child tend to
> develop the attitude that resistance to, or escape from the abuser, is futile, and this
> becomes part of their general response to people who seek to manipulate them."31
> [court's footnote: *Id.* at 2, ¶ 6.] In the psychologist's opinion, Mockovak's "history
> as a victim of childhood sexual abuse made him more vulnerable to pressure exerted
> by others to get him to do something he did not want to do, and thus made him
> more vulnerable to entrapment." [court's footnote: *Id.* at 3, ¶ 9.] Dr. Natalie Novak
> Brown, a psychologist who evaluated Mockovak for this petition in November
> 2014, concluded that Mockovak's extensive childhood sexual abuse caused both
> posttraumatic stress disorder (PTSD) and learned helplessness syndrome.
> Mockovak argues it was deficient performance not to present such expert opinions
> on learned helplessness in support of his entrapment defense.
>
> But there are legitimate tactical reasons why defense counsel would elect not to
> introduce such evidence. For instance, such testimony would open the door to
> evidence that, rather than being suggestible and easily manipulated, Mockovak was
> considered manipulative and narcissistic by many of his longtime colleagues. Many
> sent letters to the sentencing judge describing Mockovak as an amoral, remorseless,
> and calculating sociopath, who referred to himself as Dr. Machiavelli and Dr. Evil.
> Thus, a defense portraying Mockovak as helpless and susceptible to the influence
> of others could have triggered the introduction of this damaging evidence and
> undermined Mockovak's entrapment defense.
>
> Mockovak argues, however, that because Dr. Novak Brown believes he is a victim
> of PTSD and victims of PTSD are often aggressive, counsel could have countered
> any suggestion that incidents of aggressive behavior undercut his learned
> helplessness and entrapment defense. But even accepting that PTSD explains why
> Mockovak is not passive, it does not explain his past amoral, remorseless, and
> sociopathic manipulation of others. Such behavior is inconsistent with the
> proposition that Mockovak is suggestible and easily manipulated.

REPORT AND RECOMMENDATION - 33

Mockovak also contends that his counsel's misunderstanding of the law, not trial strategy, is the reason counsel did not employ a learned helplessness theory. He points to several portions of the record in support of this claim. First, he points to the declaration of his attorney friend, Ronald Marmer. According to Marmer, during a pretrial discussion about whether there was "a way to put the State to its burden of proof on the mens rea elements of the charges," trial counsel Tvedt stated that Mockovak had to choose between the defenses of diminished capacity and entrapment because he could not present both. [court's footnote: First Marmer Decl. at 3, ¶¶ 12-14.] Second, Mockovak notes trial counsel Robinson's statement in open court that under Washington law, Mockovak had to admit to the charged offense before he could plead a defense of entrapment. Mockovak claims that because "the law does not require defendants to admit the offense in order to plead entrapment, and does not require an either/or choice between entrapment and diminished capacity," his counsel mistakenly believed that they could not present both defenses. [court's footnote: Br. of Pet'r at 24.] And he contends these mistakes resulted in counsel deciding not to introduce the learned helplessness testimony.

But even assuming counsel suffered from some misunderstanding of the law, it is the conduct of trial counsel, not counsel's understanding of legal principles, that is critical to a claim of deficient performance; "*Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." [court's footnote: *Harrington v. Richter*, 562 U.S. 86, 110, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011) (citing *Strickland*, 466 U.S. at 688).]

. . .

Here, Mockovak's counsel did not pursue a diminished capacity defense. Evidence of diminished capacity seeks to show that the State has failed to prove the mens rea of the charged crime. But there is no showing that Mockovak had a viable diminished capacity defense or that learned helplessness in this setting negated Mockovak's intent. Therefore, Mockovak fails to establish that any misunderstanding about the compatibility of diminished capacity and entrapment defenses resulted in an omission adverse to Mockovak's defense. [court's footnote omitted.]

. . .

Mockovak fails to demonstrate any adverse effects from counsel's alleged misunderstanding of the law. He has not overcome the strong presumption that his counsel acted reasonably in declining to present evidence of learned helplessness. Accordingly, his claim of deficient performance fails.

Mockovak's ineffective assistance claim also fails because he does not demonstrate a reasonable probability that the outcome would have been different had evidence of his learned helplessness been presented. [court's footnote: *See Yates*, 177 Wn.2d at 36 (citing *Strickland*, 466 U.S. at 694). The "'likelihood of a different result must be substantial, not just conceivable.'" *In re Crace*, 174 Wn.2d 835, 843-44, 280

P.3d 1102 (2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011)).] Mockovak claims the evidence could have affected the verdict because the jury acquitted him of soliciting Klock's murder and some jurors mentioned in post-verdict interviews that "their decision to convict on the attempted murder of King charge was a very close call." [court's footnote: Br. of Pet'r at 45.] Mockovak's argument is not compelling.

First, since 1909, Washington has followed the rule that jury deliberations may be inquired into only to evaluate a claim of serious misconduct. "Neither parties nor judges may inquire into the internal processes through which the jury reaches its verdict." Mockovak relies on the declaration of David Snyder, a private investigator who interviewed the jurors after the verdict was returned. But Snyder's declaration reveals the jurors' internal thought processes and deliberations. Here, there is no allegation of juror misconduct, and Mockovak offers no authority that analyzing prejudice includes reflections by jurors on what may have been important or persuasive to them.

Second, unlike the plan for Klock, Mockovak finalized the plan to kill King. He gave Kultin $10,000 in cash for King's murder, along with a photograph of King and his family and King's flight information. Mockovak responded, "That sounds good" when Kultin told him that the hitmen had located King in Australia and that everything was in place for his murder. [court's footnote: Ex. 54 (Nov. 11, 2009) at 4.] And, as set forth above, there was extensive evidence that Mockovak initiated discussions with Kultin about hiring Russian hitmen. Because Mockovak took concrete steps to perfect the plot against King, the acquittal as to vague discussions about Klock is not remarkable. There is no reasonable probability that the learned helplessness evidence would have changed the outcome of the trial.

(State Court Rec. I, Ex. 2 at 19-25.)

Here, Petitioner fails to demonstrate the Court of Appeals' decision regarding counsel's alleged failure to investigate or understand Petitioner's neurological defects and psychological impairments was contrary to, or an unreasonable application of, established Supreme Court precedent under the *Strickland* standard. Based on the record, it appears trial counsel did investigate a potential diminished capacity defense and consulted an expert to explore the possibility of it as a defense in Petitioner's case. (State Court Rec. II, Ex. 25 at 340.) Trial counsel also considered presenting evidence of Petitioner's childhood sexual abuse to demonstrate Petitioner suffered from learned helplessness. (State Court Rec. III, Ex. 39 at

1    910-911.) Trial counsel's actions not to further pursue these inquiries could reasonably be

2    attributed to a desire not to open the door to other evidence that Petitioner was considered

3    "manipulative and narcissistic" by colleagues and described by others as am "amoral,

4    remorseless, and calculating sociopath, who referred to himself as Dr. Machiavelli and Dr. Evil."

5    (See State Court Rec. I, Ex. 2 at 20.) There is a strong presumption under *Strickland* and its

6    progeny that trial counsel's actions were sound trial strategy rather than inappropriate error. *See*

7    *Pinholster*, 563 U.S. at 189; *Strickland*, 466 U.S. at 689. Moreover, as considered above,

8    Petitioner fails to demonstrate his trial counsel's alleged misunderstanding of the entrapment

9    defense resulted in an objective act that was adverse to his defense. *See Harrington*, 562 U.S. at

10   110; *Strickland*, 466 U.S. at 688.

11         Next, Petitioner argues the Court of Appeals' ruling that Petitioner was not prejudiced

12   because trial counsel ultimately presented evidence in support of the entrapment defense is

13   contrary to the Supreme Court's decision in *Sears* under the prejudice prong of *Strickland*

14   standard. (Am. Pet. at 52; Traverse at 3, 59-60.) Petitioner argues there is no evidence in the

15   record suggesting Petitioner's trial counsel understood presenting evidence of Petitioner's

16   neurological defects and psychological impairments was a strategic decision. (Traverse at 59.)

17   Therefore, Petitioner argues the Court of Appeals intermingled the deficient representation prong

18   and prejudice prong of the *Strickland* standard, and thus, committed the same error committed by

19   the state court in *Sears*. (*Id.*)

20         In *Sears*, the state court in a death penalty case found trial counsel provided deficient

21   representation under *Strickland* but was "unable to assess whether counsel's inadequate

22   investigation might have prejudiced" the defendant. *Sears*, 561 U.S. at 946. Though defendant's

23   trial counsel presented "some" mitigation evidence of the defendant's cognitive impairments and

REPORT AND RECOMMENDATION - 36

childhood difficulties during the penalty phase, "but not the significant mitigation evidence a constitutionally adequate investigation would have uncovered," the state court believed it could not determine what effect a more thorough investigation might have had on the jury. *Id.* The Supreme Court granted habeas relief and determined the state court erred by not properly adjudicating the prejudice prong of the *Strickland* standard. *Id.* at 953-955. The Supreme Court noted the state court improperly truncated its prejudice inquiry by placing "undue reliance on the assumed reasonableness of counsel's mitigation theory." *Id.* at 953. The Supreme Court additionally found the state court failed to apply the proper prejudice inquiry because the presentation of "some" mitigation evidence did not foreclose the state court's inquiry into whether counsel's failures prejudiced the defendant. *Id.* at 954-55. The Supreme Court therefore concluded a proper analysis of prejudice would have considered evidence of defendant's "significant mental and psychological impairments, along with the mitigation evidence introduced during [the defendant's] penalty phase trial," to assess the prejudice prong. *Id.* at 956.

On this issue, the Court of Appeals' adjudication of the prejudice prong was not contrary to *Sears*. It appears Petitioner misinterprets the Court of Appeals' decision as the Court of Appeals clearly and distinctly adjudicated both the deficient representation and prejudice prong of the *Strickland* inquiry in its decision and found neither were satisfied. (*See* State Court Rec. I, Ex. 2 at 20-25.) The Court of Appeals found Petitioner failed to demonstrate his trial counsel's performance was deficient on the basis of a failure to investigate because, as considered above, the introduction of such evidence would have undermined Petitioner's entrapment defense and there was no demonstration trial counsel's alleged misunderstanding of the entrapment defense resulted in an objective act adverse to his defense. (See State Court Rec. I, Ex. 2 at 20-23.) Furthermore, the Court of Appeals clearly concluded Petitioner failed to demonstrate a

1  reasonable probability that, had counsel presented evidence of Petitioner's neurological defects

2  and psychological impairments at trial, the outcome would have been different. (See State Court

3  Rec. I, Ex. 2 at 30-32.) Therefore, unlike the situation presented in *Sears*, the Court of Appeals

4  did not err in its adjudication of the prejudice prong.

5       Finally, Petitioner argues that the Court of Appeals' decision was an unreasonable

6  application of the *Strickland* standard because the Court of Appeals, in its analysis of the

7  prejudice prong, failed to take into consideration the totality of Petitioner's neurological defect

8  and psychological impairment evidence.[1] (Traverse at 61-67.) Petitioner argues the Court of

9  Appeals failed specifically to discuss all of the evidence demonstrated in his first PRP, such as

10 Dr. Novick-Brown's clinical findings, that Petitioner's trial counsel allegedly failed to

11 investigate. (*Id.* at 63-66.) However, the Court of Appeals did clearly consider Petitioner's

12 proffered evidence. (*See* State Court Rec., Ex. 2 at 19-20.) Though the Court of Appeals did not

13 discuss Petitioner's neurological defect and psychological impairment evidence to the extent

14 desired by Petitioner, it is clear this evidence was considered in determining whether Petitioner

15 was prejudiced by his trial counsel's alleged failure to investigate the proffered evidence. (*See*

16 State Court Rec., Ex. 2 at 31-32 ("There is no reasonable probability that the learned

17 helplessness evidence would have changed the outcome of trial.").)

18

19

20

---

[1] In addressing this issue, Petitioner additionally argues his trial counsel's failure to develop the neurological defect and psychological impairment evidence prejudiced him at his sentencing hearing. (Traverse at 66-67.) However, it does not appear from the record that this argument was presented to the Court of Appeals (*See* State Court Rec. II, Ex. 24 at 156-70; State Court Rec. IV, Ex. 41 at 55-74) or clearly addressed as an issue throughout Petitioner's state collateral review. (*See* State Court Rec. I, Ex. 3 at 42; *id.*, Ex. 8 at 383; State Court Rec. II, Ex. 24 at 108-09; *id.*, Ex. 37 at 185-186; State Court Rec. IV, Ex. 48 at 281-82; *id.*, Ex. 51 at 425-26.) Nor was this issue raised in Petitioner's amended petition in the instant case until the submission of his traverse. (*See* Am. Pet at 52-56). Consequently, Petitioner has failed to properly raise such an issue. *See Picard*, 404 U.S. at 275-76.

REPORT AND RECOMMENDATION - 38

1    In conclusion, on Petitioner's claims premised on trial counsel's alleged failure to

2    investigate Petitioner's neurological defects and psychological impairments, Petitioner does not

3    show the Court of Appeals' adjudication was contrary to, or an unreasonable application, of

4    established Supreme Court precedent. Therefore, Petitioner's claims related to this ground

5    should be denied.

6                    iii.    Ground 1C: Failure to Object to Prosecutor's Closing Argument

7    Petitioner argues the Court of Appeals unreasonably applied *Strickland* in rejecting his

8    claim that his trial counsel should have objected to the prosecutor's closing argument concerning

9    the elements of entrapment in the jury instruction. (Am. Pet. at 27-28, 53-54; Traverse at 4-5,

10   82-92.) Petitioner argues the Court of Appeals erred because the jury instruction erroneously set

11   forth three elements of the defense of entrapment instead of two, the prosecutor incorrectly

12   argued those elements, and the Court of Appeals erroneously found the instruction correctly set

13   forth the elements. (Am. Pet. at 54; Traverse at 4-5, 82-85.) Petitioner argues that his trial

14   counsel's failure to object heightened his burden at trial of what he had to prove to establish an

15   entrapment defense. (Traverse at 85-88.) Finally, Petitioner argues the Court of Appeals also

16   erred in conflating prosecutorial misconduct with ineffective assistance and in finding the trial

17   court judge would have sustained any objection to the prosecutor's argument. (Traverse at 4-5,

18   89-92.)

19   Respondent counters that trial counsel's decision not to object during the prosecutor's

20   closing argument on the entrapment instruction was reasonable and that Petitioner did not suffer

21   prejudice because the instruction was a proper statement of entrapment law and the trial judge

22   would have denied the objection. (Answer at 29-30; Resp.'s Reply at 33-36.) Respondent

23   additionally argues the Court of Appeals correctly held the entrapment jury instruction—and the

1    prosecutor's argument on it—properly set forth state law, and this Court is bound to the Court of

2    Appeals' determination on that issue as a matter of state law. (Resp.'s Reply at 36.)

3           The Court of Appeals rejected Petitioner's argument that his trial counsel should

4    have objected to the prosecutor's statements during closing argument regarding an

5    entrapment defense in a footnote. (State Court Rec. I, Ex. 7 at 358 n.11.) In relevant part,

6    the Court of Appeals found:

7           Mockovak additionally contends that he received ineffective assistance of counsel
       when his attorney did not object to the prosecutor's statement during closing
8           argument that there were "essentially three elements " to Mockovak's entrapment
       defense. Br. of Appellant at 80. However, the trial court's instruction to the jury
9           listed four things that Mockovak was required to prove in order to succeed on this
       defense: (1) that the crime originated with law enforcement, (2) that Mockovak was
10           lured or induced to commit a crime he had not otherwise intended to commit, (3)
       that law enforcement officials did more than simply afford Mockovak an
11           opportunity to commit a crime, and (4) that the persuasion used to overcome
       Mockovak's reluctance was more than a reasonable amount.

12

13           Where a prosecutor's argument is based upon the instructions given by the trial
       court, there is no misconduct. *State v. Anderson*, 153 Wn. App. 417, 430, 220 P.3d
14           1273 (2009). Any objection by defense counsel to the prosecutor's statement during
       closing argument—which accurately reflected the court's instructions to the jury—
15           would have been properly overruled. Thus, because Mockovak fails to demonstrate
       that his attorney's decision not to object had any effect on the outcome of his trial,
16           this claim of ineffective assistance of counsel also fails. *See Leavitt*, 111 Wn.2d at
       72.

17    (State Court Rec. I, Ex. 7 at 358 n.11.)

18           Here, Petitioner fails to demonstrate the Court of Appeals' determination on this point

19    was an unreasonable application of the *Strickland* standard. In considering *Strickland's* first

20    prong, the Ninth Circuit has previously explained that "[b]ecause many lawyers refrain from

21    objecting during opening statement and closing argument, absent egregious misstatements, the

22    failure to object during closing argument and opening statement is within the 'wide range' of

23    permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th

REPORT AND RECOMMENDATION - 40

1    Cir. 1993) (citing *Strickland*, 466 U.S. at 689). As previously noted above, the entrapment jury

2    instruction proposed by Petitioner's trial counsel, and given by the trial court, was found by the

3    Court of Appeals to be a correct articulation of entrapment under Washington law. (*See* State

4    Court Rec. I, Ex. 7 at 353-58.) Despite Petitioner's preference for listing the elements of an

5    entrapment defense out as two elements, rather than four, the Court of Appeals' conclusion that

6    the instruction was a correct interpretation of Washington law is binding on this Court. *See*

7    *Bradshaw*, 546 U.S. at 76. Petitioner's trial counsel's decision not to object was reasonable given

8    that the prosecutor's argument was premised on the instruction given by the trial court and would

9    have likely been overruled.

10        In addition, the trial court did not conflate an ineffective assistance of counsel claim with

11    a prosecutorial misconduct claim. The Court of Appeals clearly applied the *Strickland* standard

12    in finding Petitioner failed to show prejudice—in that his attorney's decision not to object did

13    not have any effect on the outcome of his trial—in adjudicating his failure to object challenge.

14    (*See* State Court Rec. I, Ex. 7 at 358 n.11.) Though the Court of Appeals noted the prosecutor's

15    argument was not misconduct, the Court of Appeals denied Petitioner's relief on the basis he

16    failed to meet the *Strickland* requirement to demonstrate prejudice. (*Id.*)

17        Because the Court of Appeals' conclusion that the entrapment instruction was correct

18    under Washington law and correctly reflected the trial court's instruction to the jury, Petitioner's

19    ineffective assistance of counsel claim on this point necessarily fails to demonstrate his trial

20    counsel's performance was deficient, or that the outcome of his trial would have been different,

21    under the *Strickland* standard. Therefore, Petitioner's federal habeas petition should be denied

22    with respect to this claim for relief.

23

1

       iv.     <u>Ground 1D: Failure to Impeach Kultin</u>

2

       Petitioner argues his trial counsel provided ineffective assistance of counsel by not

3

impeaching Kultin with readily available information regarding his relationship with Klock.

4

(Am. Pet. at 54-55.) On this claim, the Court of Appeals, in its first order adjudicating

5

Petitioner's first PRP, found:

6

      Kultin testified that in 2009 Mockovak approached him and told him that Klock
      would be traveling to Germany and "[i]t would be a good time maybe to have

7

      something happen." Kultin testified this statement concerned him because it
      showed Mockovak must be spying on Klock.

8

      Mockovak argues that trial counsel was ineffective for failing to present evidence

9

      that Klock had previously accused an ex-girlfriend of hacking into his computer
      and had given Kultin access to his email to investigate this claim. He argues this

10

      evidence would have lent support for his theory that Kultin discovered Klock's
      planned trip and used it to frame Mockovak. But during cross-examination, trial

11

      counsel attempted to impeach Kultin with the fact that Kultin was in contact with
      Klock's business partner and could have learned of Klock's travel plans that way.

12

      Therefore, evidence showing that Kultin could have accessed Klock's email to
      learn about the trip was cumulative at best. It is not ineffective assistance to fail to

13

      present evidence that is merely cumulative. *State v. Peyton*, 29 Wn. App. 701, 718,
      630 P.2d 1362 (1981).

14

15

(State Court Rec. IV, Ex. 40 at 11.)

16

       Here, Petitioner fails to demonstrate his trial counsel's failure to cross-examine

17

and impeach Kultin on his relationship with Klock constituted deficient performance or

18

prejudiced him at trial. Trial counsel does not provide ineffective assistance by failing to

19

present cumulative evidence. *See Matylinsky v. Budge,* 577 F.3d 1083, 1097 (9th Cir.

20

2009) (a habeas petitioner "cannot show prejudice for failure to present what is most

21

likely cumulative evidence"); *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir.

22

1998) (citing *U.S. v. Schaflander*, 743 F.2d 714, 719 (9th Cir. 1984)). As reasonably

23

concluded by the Court of Appeals, had Petitioner's trial counsel elicited information

about Kultin's access to Klock's email on cross-examination, such evidence would have been cumulative to evidence already in the record demonstrating Kultin's knowledge of Klock's travel plans through Klock's business partner. (*See* State Court Rec. IV, Ex. 40 at 11.) Petitioner's habeas petition should be denied with respect to this claim for relief.

v.     <u>Ground 1E: Failure to Investigate and Cross-Examine Kultin's<br>Immigration Status</u>

Petitioner alleges his trial counsel provided ineffective assistance by generally failing to investigate Kultin's status as a resident alien, including: (1) the subject matter and charges of Kultin's prior arrest by Immigration and Naturalization Services ("INS"); (2) how Kultin gained admission into the United States; (3) whether Kultin had a citizenship application pending; (4) whether Kultin had previously had a citizenship application rejected; (5) whether he intended to apply for citizenship after testifying at trial; and (6) whether he was offered assistance with his immigration status by the Government. (Am. Pet. at 55; *see* Traverse at 9-11.) Petitioner additionally alleges trial counsel provided ineffective assistance by failing to cross-examine Kultin about this information. (*Id.*)

The Court of Appeals previously determined Petitioner's trial counsel knew, or was provided evidence by the Government prior to trial, that Kultin was a lawful permanent resident, that Kultin was on asylum status, and that INS had arrested Kultin in 1997. (See State Court Rec. V, Ex. 62, at 155, 159-61; *see also* State Court Rec. IV, Ex. 59, at 960-66 (summarizing Government's disclosure of Kultin's immigration status to Petitioner's trial counsel).) Therefore, Petitioner's trial counsel's decision not to pursue this line of inquiry through further investigation or cross-examination of Kultin after becoming aware of his immigration status is afforded deference on habeas review. *See Brown*, 530 F.3d at 1035; *Dows*, 211 F.3d at 487 ("[C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from

1    asking a particular line of questions, are given great deference . . . ."). Moreover, as previously

2    considered by this Court when adjudicating Petitioner's previous motion for discovery (Order

3    (Dkt. # 57) at 6-9), Petitioner's allegations concerning Kultin's motive to testify on behalf of the

4    prosecution to gain favor with his citizenship application was correctly determined to be

5    speculative. (*See* State Court Rec. V, Ex. 62 at 160-163.)

6           Accordingly, the Court concludes Petitioner fails to demonstrate trial counsel's alleged

7    failure to investigate Kultin's immigration status, or to cross-examine Kultin at trial about his

8    immigration status, constituted deficient representation or would have changed the outcome of

9    his trial. Petitioner's habeas petition should be denied with respect to this claim for relief.

10              vi.    Ground 1F: Unreasonable Determination of Facts

11           Petitioner next argues the Court of Appeals made two unreasonable determinations of

12    factual issues under 28 U.S.C. 2254(d)(2). (Am. Pet. at 61; Traverse at 67-82.) First, Petitioner

13    argues the Court of Appeals erred when it concluded Petitioner failed to cite any case that would

14    have alerted trial counsel that the WPIC on entrapment was flawed because Petitioner cited to

15    the Washington Supreme Court's decision in *State v. Lively*, 130 Wash.2d 1 (1996) extensively

16    in his appellate briefing. (Am. Pet. at 61;Traverse at 68-72.) Second, Petitioner contends the

17    Court of Appeals incorrectly determined he raised the issue of whether the entrapment defense

18    includes both an objective and subjective test for the first time at oral argument on his direct

19    appeal.[2] (Am. Pet. at 61; Traverse at 68, 72-73.)

20

21    [2] In his traverse, Petitioner additionally raises issues under 28 U.S.C. 2254(d)(2) based on the Court of
     Appeals' consideration of the entrapment defense under Washington law in *State v. Solomon,* 3

22    Wash.App.2d 895 (Wash. App. Div. I 2018), and the Court of Appeals' refusal to consider, on direct
     appeal, declaration evidence Petitioner submitted in support of his first PRP. (Traverse at 73-82.)

23    However, Petitioner failed to raise either of these issues under 28 U.S.C. 2254(d)(2) in his amended
     petition (*See* Am. Pet. at 61-62) and it is improper to raise new issues or claims in a traverse.
     *See Cacoperdo v. Demosthenes,* 37 F.3d 504, 507 (9th Cir. 1994). As such, the Court declines to consider
     either issue under Petitioner's 28 U.S.C. 2254(d)(2) challenge. Nevertheless, much of Petitioner's

1      Respondent counters Petitioner's "unreasonable determination of the facts" issues fail for

2   multiple reasons. (Resp.'s Reply at 26-33.) Respondent argues the Court of Appeals

3   determinations on these issues resolved legal issues, not factual ones. (*Id.* at 26-27.) Respondent

4   argues the Court of Appeals never said Petitioner failed to cite cases to support his claim but

5   instead correctly noted Petitioner "fail[ed] to identify any decision by a court in our state

6   indicating that—at the time of his trial—WPIC 18.05 was an incorrect statement of the law of

7   entrapment." (*Id.* at 27.) In addition, Respondent argues that this Court must accept the Court of

8   Appeals' conclusion as to the entrapment jury instruction because it is not the province of a

9   federal habeas court to reexamine state-court determinations on state-law questions and because

10   the Court of Appeals' decision was not the last reasoned decision on the issue of whether the

11   Washington state law governing entrapment includes both an "objective" and a "subjective"

12   element. (*Id.* at 30.)

13      Here, the Court presumes the state court's factual findings to be sound unless the

14   petitioner rebuts "the presumption of correctness by clear and convincing evidence." *See* 28

15   U.S.C. § 2254(e)(1); *Miller-El*, 545 U.S. at 240. On this aspect, Petitioner has failed to put forth

16   clear and convincing evidence demonstrating the Court of Appeals erred on either of his claims

17   under 28 U.S.C. 2254(d)(2). In fact, Petitioner's arguments primarily set forth issues concerning

18   the Court of Appeals' legal determinations on Petitioner's claims and not factual issues under 28

19   U.S.C. 2254(d)(2).

20      As to his first issue, Petitioner misrepresents the Court of Appeals' findings. As stated

21   above, on the issue of whether Petitioner raised a case as to the entrapment instruction, the Court

22

23   ───────────────

argument concerning the declaration issue is reiterated from his argument addressing his request for an
evidentiary hearing. Consequently, this issue is later considered in addressing Petitioner's arguments
regarding whether he is entitled to an evidentiary hearing.

REPORT AND RECOMMENDATION - 45

1    of Appeals specifically found Petitioner "fail[ed] to identify any decision by a court in our state

2    indicating that—at the time of his trial—WPIC 18.05 was an incorrect statement of the law of

3    entrapment." (State Court Rec. I, Ex. 7 at 354.) After an analysis of several state law decisions

4    concerning the entrapment instruction, the Court of Appeals' decision on Petitioner's direct

5    appeal determined, as a matter of state law, that "there was no case law at the time of

6    Mockovak's trial indicating that WPIC 18.05 contained an incorrect statement of the law . . . ."

7    (*Id.* at 357-58; *see also* State Court Rec. IV, Ex. 40 at 9-11.) Therefore, the Court of Appeals did

8    not determine a factual issue concerning whether Petitioner's direct appeal brief in and of itself

9    contained citations to case law that argued this issue but instead made a legal determination that

10    the cases cited by Petitioner did not demonstrate WPIC 18.05 contained an incorrect statement of

11    the law. *See, e.g., Rice v. Collins*, 546 U.S. 333, 342 (2006) ("The question whether a state court

12    errs in determining the facts is a different question from whether it errs in applying the law.").

13    Furthermore, the Court of Appeals' interpretation of whether WPIC 18.05 provided a correct

14    statement of law is an interpretation of Washington state law that is binding on this Court in

15    federal habeas review. *See Bradshaw*, 546 U.S. at 76.

16        As to his second issue under 28 U.S.C. § 2254(d)(2), whether Petitioner properly raised

17    an issue on direct appeal is similarly a legal issue under state law. Here, the Court of Appeals

18    determined that Petitioner failed to properly raise the issue in accordance with the Washington

19    Rules of Appellate Procedure, and therefore, declined to consider the issue. (State Court Rec. I,

20    Ex. 7 at 357 n.9 (citing *State v. Johnson*, 119 Wash.2d 167, 170-71 (Wash. 1992).) Moreover,

21    the Court of Appeals' decision on Petitioner's direct appeal was not the last reasoned decision on

22    whether Washington law governing entrapment includes both an objective and a subjective

23    element. *See Barker*, 423 F.3d at 1091-92. The last reasoned decision on this issue was the Court

1    of Appeals' decision on collateral review denying Petitioner's first PRP. (*See* State Court Rec. I,

2    Ex. 2 at 22-23 ("The entrapment instruction proposed by the defense and given to the jury

3    contained both objective and subjective elements and correctly states the law.").) As previously

4    discussed above, because the Court of Appeals correctly rejected this issue in considering

5    Petitioner's ineffective assistance of counsel claim premised on the entrapment jury instruction

6    in his first PRP, Petitioner's argument that the Court of Appeals somehow committed a factual

7    error on direct appeal by failing to consider the issue is also unavailing. The Court concludes

8    Petitioner fails to demonstrate the Court of Appeals' decision on direct appeal was based on an

9    unreasonable determination of the facts in light of the evidence presented in his state court

10   proceedings under 28 U.S.C. 2254(d)(2).

11              vii.    Ground 1G: Cumulative Error

12          In his amended habeas petition, Petitioner briefly asserts his ineffective assistance of

13   counsel claims, taken together, demonstrate cumulative error because *Strickland* prejudice

14   resulted from the cumulative effect of his trial counsel's multiple deficiencies. (Am. Pet. at 56.)

15   Even where no single error in and of itself rises to the level of a constitutional violation, "the

16   combined effect of multiple trial court errors violates due process where it renders the resulting

17   criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).

18          This Court's analysis of Petitioner's ineffective assistance of counsel claims reveals no

19   reason to depart from the Court of Appeals' analysis that Petitioner's trial counsel did not

20   provide ineffective assistance. As such, there are not multiple errors to accumulate and

21   cumulative error doctrine does not apply. Accordingly, Petitioner has not demonstrated that any

22   of the claims of ineffective assistance of counsel alleged in his petition, either singularly or

23

1    cumulatively, denied him a fair trial, and therefore, his petition should be denied with respect to

2    this claim.

3        **C.    Evidentiary Hearing**

4        Petitioner asks the Court to hold an evidentiary hearing because the Court of Appeals'

5    consideration of his ineffective assistance of counsel claim on direct appeal refused to consider

6    evidence outside the record of his direct appeal. (Am. Pet. at 58.) Specifically, Petitioner argues

7    the Court of Appeals refused to consider declaration evidence submitted from his trial counsel

8    and a local defense attorney in his direct appeal, which he submitted in his first PRP while his

9    direct appeal was pending, contrary to established PRP procedure in the Washington state courts

10   under *State v. McFarland*, 127 Wash.2d 322 (1995).[3] (*Id.*; Traverse at 74-82.) Petitioner

11   additionally argues he has not yet had the opportunity to develop the factual record on his claim

12   that the government failed to disclose material facts to him regarding Kultin and that there is a

13   substantial allegation of newly discovered evidence from the Public Records Act litigation. (Am.

14   Pet. at 59-60.)

15       Respondent argues that Petitioner essentially contends the Court of Appeals erred under

16   Washington law by resolving his claim of ineffective assistance of counsel on direct appeal

17   without consolidating his direct appeal with his first PRP. (Resp.'s Reply at 33.) As such,

18   Respondent argues, any alleged state law error in analyzing Petitioner's ineffective assistance of

19   counsel claim is not cognizable in this proceeding. (*Id.*)

20

21

22   _____

23   [3] In his traverse, in contending the Court of Appeals unreasonably determined facts under 28 U.S.C.
     2254(d)(2), Petitioner further elaborates an evidentiary hearing is warranted because the Court of Appeals
     did not order a reference hearing, erroneously refused to consider his submitted attorney declarations, and
     the Court of Appeals' fact-finding procedure did not afford him a fair or reasonable opportunity to present
     his evidence in support of his ineffective assistance of counsel claim. (Traverse at 74-82.)

REPORT AND RECOMMENDATION - 48

1       The decision to grant an evidentiary hearing lies within the discretion of the Court.

2   *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The Court "must consider whether such a

3   hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

4   entitle the applicant to federal habeas relief." *Id*. at 474 (citation omitted). The Court's review

5   under 28 U.S.C. § 2254(d)(1) is limited to the record before the state court. *Pinholster*, 563 U.S.

6   at 181-82. Therefore, a hearing is not required if the factual allegations would not entitle

7   Petitioner to relief under § 2254(d). *See Landrigan*, 550 U.S. at 474. "It follows that if the record

8   refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is

9   not required to hold an evidentiary hearing." *Id*.

10       The Court finds it is not necessary to hold an evidentiary hearing in this case because

11   Petitioner's claims may be resolved on the existing state court record. *See Totten v. Merkle*, 137

12   F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is not required on issues that can be

13   resolved by reference to the state court record."). Here, the Court of Appeals correctly rejected

14   Petitioner's claim on direct appeal, and in his first PRP, that his counsel provided ineffective

15   assistance in proposing the entrapment jury instruction because WPIC 18.05 correctly set forth

16   Washington state law regarding entrapment and his trial counsel did not provide ineffective

17   assistance by proposing the pattern instruction. (*See* State Court Rec. I, Ex. 7 at 353-58; State

18   Court Rec. IV, Ex. 40 at 9-11.) Consequently, Petitioner's claim that an evidentiary hearing is

19   warranted due to Petitioner's declaration evidence is unavailing. Furthermore, any issue

20   regarding the Court of Appeals' refusal to consolidate his claim of ineffective assistance of

21   counsel in his direct appeal with his first PRP to consider the declaration evidence concerns an

22   interpretation of Washington state procedural law, and therefore, the Court of Appeals decision

23   on how to process the claim is binding on this Court. *See Bradshaw*, 546 U.S. at 76.

Lastly, the basis of Petitioner's request for an evidentiary hearing regarding Kultin, and the government's alleged failure to disclose material facts, was previously considered by this Court and rejected as speculative in denying Petitioner's prior Motion for Leave to Conduct Discovery. (*See* Order (Dkt. # 57) at 6-9.) Because Petitioner has not alleged facts that would entitle him to habeas relief, his request for an evidentiary hearing should be DENIED.

## V.  CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. Under this standard, the Court concludes that a certificate of appealability should be denied as to all claims.

## VI.  CONCLUSION

For the foregoing reasons, this Court recommends Petitioner's amended habeas petition (dkt. # 28) be DISMISSED with prejudice. This Court further recommends that a certificate of appealability be denied with respect to all claims. A proposed Order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **twenty-one (21)** days after the filing of this Report and Recommendation. Objections, and any response, shall not exceed three pages. Failure

REPORT AND RECOMMENDATION - 50

to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motion calendar **fourteen (14)** days after they are served and filed. Responses to objections, if any, shall be filed no later than **fourteen (14)** days after service and filing of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **June 18, 2021.**

This Report and Recommendation is not an appealable order. Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

The Clerk is directed to send copies of this Report and Recommendation to the parties and to the Honorable James L. Robart.

Dated this 28th day of May, 2021.

MICHELLE L. PETERSON
United States Magistrate Judge